Annick M. Persinger (SBN #272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
T: (510) 254-6808
F: (202) 973-0950
Email: *apersinger@tzlegal.com*

Hassan A. Zavareei (SBN #181547)
Allison W. Parr*
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW Suite 1000
Washington, DC 20036
T: (202) 973-0900
F: (202) 973-0950
Email: *hzavareei@tzlegal.com*
*aparr@tzlegal.com*

[Additional counsel listed on signature page]

*Pro Hac Vice* Forthcoming

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| SARAH BROWN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PLUM, PBC,<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. Violation of the Florida Deceptive and Unfair Trade Practices Act, §501.201 *et seq.;*<br>2. Unjust Enrichment;<br><br>**JURY TRIAL DEMANDED** |

Plaintiff SARAH BROWN, on behalf of herself and all others similarly situated ("Plaintiff"), by and through her undersigned attorneys, brings this Class Action Complaint (the "Action") against Defendant PLUM, PBC ("Plum" or "Defendant") based upon personal knowledge as to herself and her own acts, and as to all other matters upon information, investigation, and belief of counsel.

## INTRODUCTION

1.      Defendant Plum sells baby food products under the brand name "Plum Organics," which come in a variety of forms including pouches, snacks (including "Cereal Super Puffs," Teether/Wafers, Snack Bars, and Fruit Snacks) and milk-based powders for produced, marketed, and sold for consumption by infants and young children (collectively, the "Products").[1] These Products are marketed to parents to give to their young children to consume; and contrary to the fact that these Products are intended for young children, the Products contain contaminants: including inorganic arsenic ("arsenic"), lead, cadmium, and mercury (collectively, the "Heavy Metals"), that public health authorities and child-safety organizations unanimously agree pose serious risks to children's health and well-being.[2]

2.      Defendant knows that food safety is of primary concern to parents. Defendant conceals the existence of these Heavy Metals in the Products' listed ingredients. The omitted information is wholly inconsistent with the Products' label representations, which are intended to— and do, in fact—persuade reasonable consumers that the Products are fit for consumption by children.

3.      Defendant uses consistent messaging across different Product formulations, different media, and marketing touchpoints, meaning that messaging for any one Product formulation reinforces Defendant's inaccurate and misleading claims for other and all formulations.

---

[1] This is by no means an exhaustive list of Defendant's Products at issue in this Complaint, but merely a representative sample.

[2] "*Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*," House of Representatives Subcommittee on Economic and Consumer Policy (Committee on Oversight and Reform), Staff Report (Feb. 4, 2021), 2021-02-04 ECP Baby Food Staff Report.pdf (house.gov) ("Congressional Report").

4.     The Heavy Metals contained in Defendant's Products are not nutritious, and no reasonable parent would feed a child meals and snacks containing elevated and unacceptable levels of arsenic, lead, cadmium, or mercury.

5.     The Congressional Report by the United States House of Representatives Committee on Economic and Consumer Policy (Committee on Oversight and Reform), examines misconduct concerning prominent brands of baby foods. It states: "Even low levels of exposure can cause serious and often irreversible damage to brain development."[3] Defendant's Products not only contain these Heavy Metals but contain levels of the Heavy Metals that are unacceptable by virtually any public health standard, and certainly are unacceptable to reasonable parents.

6.     By virtue of this conduct, and all of the conduct alleged herein, Plaintiff and all members of the Class have been injured by Defendant's actions.

## JURISDICTION AND VENUE

7.     **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of costs and interest, exceeds the sum of $5 million in the aggregate. In total, there are well over 100 members of the proposed Classes that are known to exist, and this is a class action in which complete diversity exists between one Plaintiff and one Defendant – namely, that Plaintiff is a citizen of Florida, while Defendant is headquartered in, and therefore is a citizen of, California.

8.     **General Personal Jurisdiction**. This Court has general personal jurisdiction over Defendant because Defendant purposefully availed itself of the privilege of doing business within the state, including within this District; had continuous and systematic general business contacts within the state, including within this District; and Defendant can be said to have reasonably anticipated being haled into court in this forum.

9.     **Specific Personal Jurisdiction**. This Court has specific personal jurisdiction over Defendant because this action arises out of and relates to Defendant's contacts with this forum. Specifically, Defendant is headquartered in this District and Defendant knowingly directed the

---

[3] Congressional Report at 2.

Products through the stream of commerce into this District. Defendant advertised and marketed within this District through the wires and mails and via e-commerce websites through which residents of this state and District can purchase the Products. Defendant knowingly directs electronic activity into this state and District with the intent to engage in business interactions and has, in fact, engaged in such interactions. Defendant cultivated a market for the Products in this state and District and systematically served a market for the very Products causing the harms alleged in this Complaint. Thus, there is an affiliation between this forum and the underlying controversy and there is a strong relationship among Defendant, the forum, and the litigation.

10.     **Venue**. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Venue also is proper pursuant to 28 U.S.C. 1391(b)(1) and 1391(c)(2) because Defendant is deemed to be a resident of this District by virtue of the Court's personal jurisdiction over Defendant with respect to this action.

## PARTIES

11.     Plaintiff Sarah Brown is a citizen of the State of Florida and is a member of the Class as a purchaser of Defendant Plum's Products. Plaintiff purchased the Products – namely, Plum's "Plum Organics" Mighty Morning Apple Bars (Apple Cinnamon) and Plum's "Plum Organics" Mighty Snack Bars (Blueberry) – at retail during the applicable Class Period, specifically during the year 2021. Plaintiff relied on Defendant's representations (and omissions) as described herein, and Plaintiff was harmed by way of Defendant's representations (and omissions).

12.     Defendant Plum, PBC is a citizen of the State of California, as it maintains its headquarters here, and is incorporated in the State of Delaware. Plum's Products are produced by the same company which makes Campbell's Soup.

## FACTUAL ALLEGATIONS

I.     **DEFENDANT MARKETS AND LABELS ITS PRODUCTS AS BEING FIT FOR CONSUMPTION BY CHILDREN AND REASONABLE CONSUMERS RELIED ON DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS**

13.     The demand for wholesome baby food products is constant as parents continuously seek to protect their children, as best they can, from all unreasonable risks of harm. Defendant understands this demand and therefore promotes its Products as organic; Defendant also markets its

Products as being fit for consumption by children. Indeed, the Products all contain the following substantially similar material statements that represent that the Products are wholesome, safe, and nutritious for children.

14.    Examples of these material statements on the Defendant's website are:

- "As an organic food company, we strongly believe in the advantages organic food brings to our families and to Mother Nature. We know there's a debate as to whether organic is more nutritious or safer than conventional, but when it comes to making products for your littlest ones, we believe the simpler the better. As parents ourselves, we wouldn't have it any other way."[4]
- "Little ones deserve the very best food from the very first bite."[5]
- "Plum products are always made without genetically modified ingredients."[6]

15.    After the release of the Congressional Report, Defendant released the following statement on its website:

As parents who feed Plum to our own kids every day, we understand you may have questions about some of the news you're reading. We're here to address concerns as clearly, honestly and immediately as possible.

The House of Representatives Committee on Oversight and Reform recently released a report about heavy metals in baby and toddler food products, including Plum Organics.

Plum Organics has always and will always place the safety of our consumers, especially our youngest consumers, above all else. That is why we cooperated with the Committee's baby food review. We responded quickly to their questions and never refused anything requested of us. We are surprised that the Committee would suggest that we were less than full partners in this mission. We welcomed the opportunity to work with the Committee in 2019—and continue to do so today.

We are confident in the safety and quality of our products. Our top priority is to serve children healthy, nutritious food made from the best ingredients. We want to assure you that Plum's products are safe (and delicious) to eat! If we didn't feel good about our products, we wouldn't serve them to our children or yours.[7]

---

[4] https://www.plumorganics.com/food-philosophy/ (last accessed May 28, 2021).

[5] *Id.*

[6] *Id.*

[7] https://www.plumorganics.com/faqs/ (last accessed May 28, 2021) (emphasis added).

16.    Additionally, Defendant includes the following misrepresentations on the labels and packaging for its Products,[8] which it manufactures, markets, and sells:



17.    On Amazon, which is a popular distribution channel for Defendant's Products, the products are advertised as "*Organic, Non-GMO Snack Bar[s]: Plum uses only organic, non-GMO ingredients.*"[10]

18.    All of the aforementioned statements in this section – from the statements on the Defendant's website, to their statement after the release of the Congressional Report, to the representations that are made on packaging and on Amazon – are demonstrably false.

19.    Plaintiff purchased the Products, which contain materially similar representations to all Products at issue in this Complaint. Plaintiff and all members of the Class viewed the representations on the labeling of the Products at the point of purchase. These representations are

---

[8] The selected misrepresentations appeared on the packaging for the same types of Products purchased by Plaintiff.

[9] https://www.amazon.com/Plum-Organics-Organic-Toddler-Strawberry/dp/B00J3I6CXO (last accessed May 28, 2021).

[10] *Id.*

intended to impact, and do in fact impact, every reasonable parent's decision regarding which foods to purchase for their young children.

20.    Plaintiff the Class relied on these representations, specifically the representations conveying the organic and wholesome nature of the product, when making their purchases.

21.    Other Products in the Product family have substantively similar label.

22.    Critically, Defendant promotes the Products as safe and health for children yet conceals the presence and elevated levels of the Heavy Metals because no reasonable parent would purchase the Products at the price offered, or on the same terms, or as frequently, or would not purchase the Products at all if this information were disclosed.

23.    As the retailer, manufacturer, and seller of the Products, Defendant is responsible for the accuracy of information conveyed on the Product labels.

24.    Plaintiff reasonably believed that the Products she purchased were free of concerning levels of Heavy Metals that, in fact, were present at levels that would gravely concern any reasonable consumer.

25.    Defendant knew or, in the exercise of reasonable care, should have known that the Products' labels were false or misleading.

26.    Defendant intended for consumers to rely upon its representations and omissions concerning the Products' nature and quality.

27.    It would be reasonable for consumers to rely—as Plaintiff did—upon Defendant's representations and omissions concerning the Products.

28.    Defendant's misrepresentations and omissions were made with the intent to generate and increase sales of the Products.

29.    Defendant's misrepresentations and omissions were deceptive and misleading for the reasons set forth in this Complaint; and they are ongoing.

30.    By representing the Products as wholesome and organic, Defendant implicitly represented the Products' value to Plaintiff and other consumers.

31.    As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly-situated consumers purchased a product of different and substantially lesser value—one

with a higher effective cost—than Defendant represented, under the false impression that the Products were safe, high-quality, premium Products free of elevated levels of Heavy Metals.

32.    In fact, because the Products contained elevated levels or had a high risk of containing unsafe levels of Heavy Metals, they should not have been on the market in the first place, and thus the Products were of less value or even valueless—*i.e.*, the threat of exposure to high levels of Heavy Metals would render the Products of no value to reasonable consumers because no reasonable consumer would willingly administer repeated, elevated doses of Heavy Metals to his or her child.

33.    Defendant's omission of all reference to the Heavy Metals deprived Plaintiff and other consumers the opportunity to make an informed choice whether to purchase the Products.

34.    Accordingly, Plaintiff and the Class did not realize the benefit of the bargain and their expectations were not met.

35.    Plaintiff and the Classes effectively paid more than the market value represented by the price bargained for. Plaintiff and the Class bargained with Defendant on a particular market value for a Product purporting to be a high-quality, premium food—one that would not contain unacceptable levels of Heavy Metals.

36.    However, unbeknownst to consumers, the Products do contain or have a high risk of containing unacceptable levels of Heavy Metals; Plaintiff and the Classes thus effectively paid for Products that were worth less than they were led to reasonably believe, *i.e.*, Plaintiff and the Classes overpaid for the Products.

37.    Thus, through the use of misleading representations and omissions, Defendant obtained enhanced negotiating leverage allowing it to command a price Plaintiff and the Class would not have paid had they been fully informed.

38.    By use of misleading marketing and labeling claims and omissions, Defendant created increased market demand for the Products and increased its market share relative to what its demand and share would have been had it marketed and labeled the Products truthfully.

39.    Plaintiff and the Class lost money as a result of Defendant's misrepresentations and omissions in that they did not receive what they reasonably believed they were paying for based

upon the misrepresentations and omissions. Plaintiff and the class detrimentally altered their position and suffered damages as a result of Defendant's misrepresentations and omissions.

40.     If Plaintiff had been aware that the Products contained unacceptable levels of any Heavy Metal, Plaintiff would have purchased a different product or no product at all. In other words, Plaintiff would not have purchased Defendant's Product but for Defendant's misrepresentations and omissions.

41.     Plaintiff and the Class were exposed to and justifiably relied upon the same material misrepresentations and omissions made on the Products' labels.

## II.     THE TRUTH IS REVEALED

42.     The recent Congressional Report released by the United States House of Representatives revealed that prominent brands of baby food Products contains "concerning levels" of the Heavy Metals at-issue.

43.     Public health authorities have expressed concern regarding consumption of the Heavy Metals. For example, according to the Congressional Report, the FDA has expressed concern regarding arsenic levels above 100 ppb in infant rice cereals, arsenic above 10 ppb in drinking water, lead above 5 ppb in drinking water, lead above 50 ppb in juice products, and cadmium above 5 ppb in drinking water.

44.     Defendant's Products routinely tested at levels exceeding these limits.

45.     Even more concerning, the Congressional Report states: "[Plum] refused to cooperate with the Subcommittee's investigation. The Subcommittee is greatly concerned that their lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."[11]

46.     The Congressional Report continues, "[t]he Subcommittee has grave concerns about baby food products manufactured by … Campbell (Plum Organics). Th[is] company[y] refused to cooperate with the Subcommittee's investigation. The Subcommittee is greatly concerned that their

---

[11] Congressional Report at 2.

CLASS ACTION COMPLAINT FOR DAMAGES

lack of cooperation might obscure the presence of even higher levels of toxic heavy metals in their baby food products, compared to their competitors' products."[12]

47.    Specific to Plum, the report states:

> Campbell refused to produce its testing standards and specific testing results to the Subcommittee. Campbell has hidden its policies and the actual level of toxic heavy metals in its products. Instead of producing any substantive information, Campbell provided a spreadsheet self declaring that every one of its products "meets criteria."

> Campbell declined to state what those criteria are… Campbell's testing summary hides more than it reveals, since it does not show the levels of heavy metals that the testing found or the levels of heavy metals that would "meet criteria." The Subcommittee was disturbed that, for mercury, which is a powerful neurotoxin, Campbell notes with asterisks that it has no criterion whatsoever, stating: "No specific threshold established because no high-risk ingredients are used."

> However, despite Campbell having no mercury threshold, Campbell still marked every food as "meets criteria" for mercury. This misleading framing—of meeting criteria that do not exist—raises questions about what Campbell's other thresholds actually are, and whether they exist.

> Campbell's evasion is concerning, as even limited independent testing has revealed the presence of toxic heavy metals in its baby food.[13]

48.    However, both testing by Congress' House Oversight Committee in 2019 and additional testing by the Plaintiff (and her counsel) recently found the presence of Heavy Metals in Defendant's Products.[14]

## III.    THE DANGER OF HEAVY METALS FOUND IN DEFENDANT'S PRODUCTS AND DEFENDANT'S SALE OF SAID PRODUCTS

49.    The Congressional Report emphasized the dangers posed by the Heavy Metals in Defendant's Products:

> Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior. Babies' developing brains are "exceptionally sensitive to injury caused by toxic chemicals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity." The fact that babies are small, have other developing organ systems, and absorb

---

[12] *Id.* at 5.

[13] *Id.* at 44-45.

[14] Campbell, *Product Heavy Metal Test Results* (Dec. 11, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/12.pdf.

CLASS ACTION COMPLAINT FOR DAMAGES

more of the heavy metals than adults, exacerbates their risk from exposure to heavy metals. Exposure to heavy metals at this developmental stage can lead to "untreatable and frequently permanent" brain damage, which may result in "reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior." For example, a recent study estimates that exposure to environmental chemicals, including lead, are associated with 40,131,518 total IQ points loss in 25.5 million children (or roughly 1.57 lost IQ points per child)—more than the total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288), and traumatic brain injury (5,827,300) combined. For every one IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000. Well-known vectors of child exposure to toxic heavy metals include lead paint in old housing and water pollution from landfills. Over the decades, a range of federal and state laws and regulations have been passed to protect child health through emissions standards, among other things. The Food and Drug Administration (FDA) has declared that inorganic arsenic, lead, cadmium, and mercury are dangerous, particularly to infants and children. They have "no established health benefit" and "lead to illness, impairment, and in high doses, death." According to FDA, "even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern." FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure. The Subcommittee on Economic and Consumer Policy's investigation has found another source of exposure: baby foods. According to documents obtained from baby food manufacturers, toxic heavy metals, such as arsenic, cadmium, lead, and mercury are present at substantial levels in both organic and conventional baby foods. Currently, there is no federal standard on, or warning to parents and caregivers about, these toxins.[15]

50.     With respect to arsenic, the Congressional Report states:

Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR). The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children." Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children." This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children." A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores." The authors pegged 5 ppb as an important threshold. Likewise, a study of children in Spain found that increasing arsenic exposure led to a decrease in the

---

[15] Congressional Report at 9-10 (internal citations omitted).

CLASS ACTION COMPLAINT FOR DAMAGES

children's global motor, gross motor, and fine motor function scores. Boys in particular were more susceptible to arsenic's neurotoxicity.[16]

51.    With respect to lead, the Congressional Report states:

Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Even small doses of lead exposure are hazardous, particularly to children. Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. According to FDA, lead is especially dangerous to "infants" and "young children." FDA acknowledges that: High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system. Neurological effects from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Because lead can accumulate in the body, even low level chronic exposure can be hazardous over time. Lead exposure severely affects academic achievement in children. Even at low levels, early childhood lead exposure has a negative impact on school performance. Two separate studies of schoolchildren in Detroit and Chicago public schools found a strong inverse relationship between lead exposure and test scores. In the Detroit study, there was a "significant association" between early childhood lead exposure and decreased standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement. The Chicago study found that higher blood lead concentrations were associated with lower reading and math scores in 3rd grade children. Increased blood lead concentrations correlated with a 32% increase in the risk of failing reading and math. The cognitive effects of early childhood lead exposure appear to be permanent. In one study, adults who previously had lead-associated developmental delays continued to show persisting cognitive deficits, demonstrating the long-lasting damage of lead exposure.[17]

52.    With respect to cadmium, the Congressional Report states:

Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Cadmium is associated with decreases in IQ, as well as the development of ADHD. A 2018 study found that cadmium exposure negatively affected children's Full Scale IQ, particularly among boys. Boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure. A 2015 study similarly found a significant inverse relationship between early cadmium exposure and IQ. A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.[18]

---

[16] *Id.*

[17] *Id.* at 11.

[18] *Id.* at 12.

CLASS ACTION COMPLAINT FOR DAMAGES

53.     With respect to mercury, the Congressional Report states:

> Mercury is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Studies of mercury's effect on childhood development have primarily been conducted by considering the mother's exposure to mercury while pregnant. In these instances, "pre-natal mercury exposure has been consistently associated with adverse subsequent neuro-development." And pre-natal mercury exposure is also related to poorer estimated IQ. Beyond prenatal exposure, higher blood mercury levels at "2 and 3 years of age were positively associated with autistic behaviors among preschool-age children.[19]

54.     Defendant has shown no concern for the health risks faced by the end-users of its Products: namely, vulnerable young children. In fact, to date, Defendant continues selling these Products without any indication to consumers that the Products may contain alarming levels of Heavy Metals.

55.     Not only did Defendant knowingly mislead parents into believing the Products were safe, but Defendant charged a premium for them. Plaintiff and the Class would not have purchased the Products if they were aware of the elevated presence of the Heavy Metals or, alternatively, they would not have purchased at the Products' offered price and terms.

## IV.     DUE TO THE DEFENDANT'S MISCONDUCT, PLAINTIFF AND THE CLASS SUFFERED ECONOMIC INJURY

56.     Plaintiff and the Classes were injured economically when they purchased the Products. As alleged herein, Plaintiff and the Class received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for Products which were supposed to be wholesome, but were not. No reasonable consumer would have purchased or paid as much or as frequently for the Products had they known the Products contained elevated levels of Heavy Metals. Defendant knew of the Heavy Metals and the levels at which they occur in the Products, but chose not to disclose this material information to their consumers in an effort to persuade them they were buying wholesome Products rather than Products with elevated levels of Heavy Metals.

---

[19] *Id.* at 12-13.

CLASS ACTION COMPLAINT FOR DAMAGES

**CLASS ACTION ALLEGATIONS**

57.    Plaintiff brings this action on behalf of herself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of members of the following proposed Class:

> All persons within the United States who purchased one or more of the Products from the beginning of the applicable statutory period through present.

58.    Excluded from the Class are Defendant, any of their respective members, affiliates, subsidiaries, officers, directors, employees, successors or assigns, the judicial officers, and their immediate family members; as well as the Court staff assigned to this Action.

59.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff also seeks to represent the following Florida subclass:

> All persons within the Florida who purchased one or more of the Products from the beginning of the applicable statutory period through present.

60.    Excluded from the Florida Subclass are Defendant, any of their respective members, affiliates, subsidiaries, officers, directors, employees, successors or assigns, the judicial officers, and their immediate family members; as well as the Court staff assigned to this Action.

61.    Plaintiff reserves the right to modify or amend Class definitions as appropriate during the pendency of this Action.

62.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

63.    This action has been brought and may be properly maintained as a class action under the criteria of Rule 23:

**Numerosity – Rule 23(a)(1)**. The members of each of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class numbers is unknown to Plaintiff but is likely to be ascertained by Defendant's records. At a minimum, there likely are tens of thousands of Class Members.

**Commonality and Predominance – Rule 23(a)(2), (b)(3)**. This action involves questions

of law and fact common to the Classes, which predominate over any individual questions, including:

   a.   whether Defendant engaged in the conduct alleged herein;

   b.   whether Defendant's course of conduct alleged herein violates the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.;

   c.   whether Defendant knew or should have known its representations and omissions were false or misleading;

   d.   whether reasonable consumers were misled by Defendant's labeling, marketing and advertising of the Products;

   e.   whether Defendant was unjustly enriched by retaining monies from the sale of the Products at issue;

   f.   whether certification of the Class is appropriate under Fed Rule 23;

   g.   whether Plaintiff and the Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief; and

   h.   the amount and nature of the relief to be awarded to Plaintiff and the Class, including whether Plaintiff and the Class are entitled to punitive damages.

   **Typicality – Rule(a)(3)**. Plaintiff's claims are typical of the other Class members because the Plaintiff, as well as the members of the Class, paid for Defendant's contaminated Products at retail. Plaintiff and the members of the Class relied on the representations and omissions made by the Defendant prior to making their purchase of the Products at issue. Plaintiff and the Class paid for Defendant's products at retail and would not have purchased them (or would have paid substantially less for them) had they known that the Defendant's representations were untrue and/or had they possessed the information Defendant omitted from the labels regarding the Heavy Metals.

   **Adequacy of Representation – Rule 23(a)(4)**. Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff have retained counsel competent and experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

   **Superiority of Adjudication as a Class Action – Rule 23(b)(3)**. To preserve judicial

economy, this case will be best maintained as a class action, which is superior to other methods of individual adjudication of these claims. This Action is best maintained as a class action because of the large number of consumers affected by the alleged violations of law as well as the relatively smaller-purchase economic damages being sought by Plaintiff and the Class. The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct, such that it would be virtually impossible for the Class to redress the wrongs done to them and they would have little incentive to do so given the amount of damage each Class member has suffered when weighed against the costs and burdens of litigation. The class procedure presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and supervision by a single court.

**Certification of Specific Issues – Rule 23(c)(4)**. To the extent that a Class does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiff seek certification of issues that will drive this litigation toward resolution. Declaratory and Injunctive Relief – Rule 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to, or allow their resellers to, advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Class will continue to be misled, harmed, and denied their rights under the law.

64.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*
(on behalf of Plaintiff individually and the Florida Subclass)**

65.    Plaintiff realleges and incorporates the foregoing paragraphs.

66.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201*, et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to

"protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

67.   FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The FDUTPA also prohibits false and misleading advertising.

68.   Plaintiff and all Class members are "consumers" and Defendant has engaged in "trade or commerce" as defined by FDUTPA. Fla. Stat. § 501.203(7)-(8).

69.   Defendant manufactures, distributes, markets, advertises and sells the Products. The Products are "goods" within the meaning of FDUTPA.

70.   For the reasons discussed herein, Defendant violated and continues to violate FDUTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute §501.201, *et seq.*

71.   Defendant engaged in unconscionable, unfair or deceptive acts and practices by, among other things, representing that the Products are healthy, nutritious, organic, made from the best ingredients, and safe for consumption, and by failing to make any mention of Heavy Metals, or other undesirable toxins or contaminants in the Baby Foods.

72.   Defendant's acts and practices, including its omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment. Consumers, including Plaintiff and Class Members, would not have purchased the Products, or would have paid less for them, had they known that the Products were not healthy, nutritious, organic, made from the best ingredients, and safe for consumption, or that they contained Heavy Metals, or other undesirable toxins or contaminants in the Baby Foods.

73.   Plaintiff and the Class have been aggrieved by Defendant's violative representations, omissions, and practices and their rights have been adversely affected and, therefore, Plaintiff and the Class are entitled to injunctive and declaratory relief under FDUTPA.

74.     Defendant's misrepresentations are ongoing such that declaratory or injunctive relief requiring Defendant to make only truthful statements in its marketing and labeling of the Products would correct its ongoing violations of FDUTPA and the ongoing harms caused by those violations.

75.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff and Class Members have been damaged, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

76.     Plaintiff, individually and on behalf of the Class, seeks: (a) a declaration or declaratory judgment that Defendant's acts and practices have violated and continue to violate FDUTPA; (b) an order enjoining Defendant to refrain from the acts and practices that have violated and continue to violate FDUTPA, and an order to undertake an immediate public information campaign to inform members of the proposed class as to their prior practices; (c) actual damages; (d) attorney's fees and court costs; and (e) any other legal or equitable relief to which Plaintiff or the Class members may be entitled.

## COUNT II
### Unjust Enrichment
### (on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

77.     Plaintiff realleges and incorporate the foregoing paragraphs.

78.     Plaintiff and the Class have conferred a benefit on Defendant in the form of payment for the Products alleged herein.

79.     Defendant was aware of this benefit, voluntarily accepted it, and has retained and appreciated this benefit, to which it is not entitled, at the expense of Plaintiff and the Classes.

80.     By its wrongful acts and omissions described herein, Defendant was unjustly enriched at the expense of Plaintiff and Class Members.

81.     Plaintiff and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged in this Complaint.

82.     For the reasons set forth in this Complaint, the circumstances are such that it would be inequitable and unfair for Defendant to retain the full amount of the benefit conferred upon it by Plaintiff and the Class, and fairness demands that Defendant pay for the benefit.

83.    As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and the Class are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other benefits obtained by Defendant for its inequitable and unlawful conduct.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

1.    Certifying this case as a class action representing the Classes as defined herein pursuant to Rule 23, designate Plaintiff as representatives for the Classes, and appoint counsel of record as class counsel;

2.    Declaring Defendant's conduct unlawful under the statutes and causes of action pled herein;

3.    Entering an order enjoining Defendant to refrain from the acts and practices cited herein and to undertake an immediate public information campaign to inform members of each of the Classes as to its prior practices;

4.    Entering an order requiring imposition of a constructive trust and and/or disgorgement of Defendant's ill-gotten gains and to pay restitution to Plaintiff and all members of each of the Classes to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice;

5.    Entering an award of damages, including all available statutory and punitive damages, pursuant to the statutes and the causes of action pled herein;

6.    Entering an order Defendant to pay for the costs of the proceedings herein as well as reasonable attorney's fees, costs, and expenses as allowable by statute or other law;

7.    Entering an order requiring Defendant to proffer an equitable plan to refund the Plaintiff's and the Class members' monies; and

8.    Awarding any other such relief that this Court deems necessary and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**JURY TRIAL DEMAND**</u>

Plaintiff and members of the Class hereby demand a trial by jury of all issues so triable.

DATED:    June 28, 2021                                   Respectfully Submitted,

<u>*s/ Annick M. Persinger*</u>

Annick M. Persinger (SBN #272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
T: (510) 254-6808
F: (202) 973-0950
Email: *apersinger@tzlegal.com*

Hassan A. Zavareei (SBN #181547)
Allison W. Parr*
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW Suite 1000
Washington, DC 20036
T: (202) 973-0900
F:  (202) 973-0950
Email: *hzavareei@tzlegal.com*
         *aparr@tzlegal.com*

Daniel L. Warshaw (SBN #185365)
Michael H. Pearson (SBN #277857)
**PEARSON SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
T: 818-788-8300
F: 818-788-8104
Email: *dwarshaw@pswlaw.com*
         *mpearson@pswlaw.com*

Melissa S. Weiner*
Daniel K. Asiedu*
**PEARSON SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
T: 612-389-0600
F: 612-389-0610
Email: *mweiner@pswlaw.com*
         *dasiedu@pswlaw.com*

CLASS ACTION COMPLAINT FOR DAMAGES

Rebecca K. Timmons (Fla. Bar No. 121701)*
**LEVIN PAPANTONIO RAFFERTY**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
T: (850) 435-7140
Email: *btimmons@levinlaw.com*

Blake Hunter Yagman*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
T: (212) 594-5300
Email: *byagman@milberg.com*

Rachel Soffin*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
T: (865) 247-0080
Email: *rsoffin@milberg.com*

*Pro Hac Vice* Forthcoming

*Attorneys for Plaintiff and Proposed Class*

CLASS ACTION COMPLAINT FOR DAMAGES